AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )  Case No.  1:20-MJ-00244 |
| THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER | ) |
| 513-693-3004 (Sprint) | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference).

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution of a Controlled Substance |
| 21 U.S.C. 846 | Conspiracy to Distribute a Controlled Substance. |

The application is based on these facts:

See AO 106 Attachment (incorporated by reference).

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph Klump, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  **Mar 16, 2020**

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

**AO 106   Attachment**


  See Affidavit in Support of an Application for a Search Warrant.  To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order.  Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation.  *See* 18 U.S.C. §§ 3122(b), 3123(b).


  I declare under penalty of perjury that the foregoing is true and correct.


3/16/2020 _____    *s/Ashley N. Brucato*_____
DATE             ASHLEY N. BRUCATO (0090989)
                Assistant United States Attorney

## <u>ATTACHMENT A</u>

**Property to Be Searched**

1. The cellular telephone assigned call number 513-693-3004 **(TARGET TELEPHONE)** whose wireless service provider is Sprint, a wireless telephone service provider headquartered in Overland Park, KS.

2. Information about the location of the cellular telephone assigned call number **TARGET TELEPHONE** that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

**ATTACHMENT B**

**Things to be Seized**

All information about the location of the target cell phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the target cell phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint. Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint services, including by initiating a signal to determine the location of the target cell phone on the Sprint network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance. In addition, the government may initiate a signal to determine the location of the target cell phone.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 513-693-3004 (Sprint) | CASE NO. 1:20-MJ-00244 <br> UNDER SEAL |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Joseph Klump, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **513-693-3004** (hereinafter "**TARGET TELEPHONE**"), whose service provider is Sprint, a wireless telephone service provider headquartered in Overland Park, KS. The targeted cell phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cincinnati, Ohio Field Office Division, and have been so employed since June 2016. As a

Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I am currently assigned to investigate matters involving violent crimes, violent crimes against children, organized crime, criminal enterprises, and narcotics to include the unlawful possession, possession with intent to distribute, and actual distribution of controlled substances. I have participated in the preparation and execution of Federal arrest and search warrants related to numerous criminal offenses, including those involved in the current investigation, in my position as a Special Agent. I have also been involved with the analysis of pen registers, the monitoring of Title III wire intercepts, and the installation and monitoring of tracking devices for vehicles in relation to narcotics investigations. Further, I have been the affiant and obtained numerous Federal warrants for the cell phone data location of fugitives and subjects under investigation by the FBI.

4. In my experiences I have had the opportunity to monitor, listen, and review transcripts pertaining to communications which involved the trafficking of illegal narcotics by persons who attempted to thwart law enforcement by speaking in some sort of coded language. I have also participated in numerous post arrest and proffer interviews of individuals with knowledge of illegal drug trafficking that had been involved in using coded language and were familiar with day to day operations utilized by those involved in the illegal trafficking of narcotics. Through these interviews and other investigative experiences, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon utilized by illegal drug traffickers in the course of conducting their criminal activities.

5. In addition, I have utilized confidential informants, pen registers, toll records, physical surveillances, and electronic surveillances in the process of my investigations to further my knowledge regarding the operations of those involved in illegal narcotics

2

distribution. I have further been the affiant on Federal search warrants, have testified in Grand Jury proceedings, and have written reports during the course of conducting investigations.

6. Through my training, experiences, and communications with other experienced agents and officers who conduct drug investigations, I have become familiar with methods used by drug traffickers to import, transport, store, collect, and safeguard illegal narcotics. Additionally, my training and experiences have given me knowledge regarding the methods used by drug traffickers to communicate with each other, to launder drug proceeds, and to thwart efforts by law enforcement to detect their illegal activities. I also have gained intelligence through my experiences, and through conversations with others who have conducted drug-related investigations, in regard to methods by which drug traffickers package, prepare, and distribute narcotics.

7. Prior to being employed with the FBI, I worked as a police officer for the city of Wyoming Ohio for six years. In my position as a police officer I gained knowledge and experience through participating in a multitude of criminal investigations involving robberies, assaults, firearms violations, fraud, theft, burglary, possession and distribution of illegal narcotics, kidnappings, missing persons, rape, and various others. In my experience as a police officer, I routinely conducted interviews and composed reports regarding the investigations in which I was involved. Additionally, I have assisted in the preparation and execution of State search and arrest warrants in Ohio.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses.  Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 United States Code, Sections 841(a)(1) and 846 have been committed, are being committed, and will be committed by Jerome NEWTON Jr. (hereinafter "NEWTON"), Jimmy DANIEL III (hereinafter "DANIEL"), and other as-yet unknown individuals. I believe there is probable cause that the **TARGET TELEPHONE** is being used in furtherance of the aforementioned crimes. There is also probable cause to believe that the location information described in Attachment B of **TARGET TELEPHONE** will constitute evidence of those criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

10. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

11.  During 2018, federal, state, and local law enforcement learned of a major drug trafficking organization (DTO) operating throughout the greater Cincinnati region.  The DTO is led by Steffen Roberson aka "Worm" who primarily lives in Atlanta, Georgia.  Dozens of interviews of subjects, cooperating defendants, sources of information, and confidential informants revealed that Steffen Roberson has a large network operating under his command and control which was generating millions of dollars annually from the sale of narcotics, with the primary drug sold being fentanyl.  Multiple recent homicides throughout Cincinnati are alleged to be "hits" carried out at the direction of Roberson and his main DTO members.

4

12. Additional information obtained from confidential informants have identified Jerome NEWTON, aka "Boo," aka "Rome," as a narcotics dealer working for Steffen Roberson in the Cincinnati, OH area. In 2018, while conducting physical surveillance, investigators witnessed NEWTON at a rap studio named Pure Quality Media rap studio located at 1833 Galbraith rd. in North College Hill, OH. This rap studio was known by investigators to be operated by Steffen Roberson and utilized for illegal gambling and drug trafficking activities by Roberson and his associates. Further, a Confidential Human Source (hereinafter "CHS1[1]") has advised investigators that he/she has participated in narcotics transactions involving multiple kilograms of heroin/fentanyl with NEWTON and Steffen Roberson in the past. CHS1 further advised that NEWTON has attempted to purchase multiple kilograms of cocaine from CHS1 in the past.

13. In January 2020, the Cincinnati Police Department Violent Crime Squad (Cincinnati VCS) began a narcotics investigation into NEWTON and Jimmy DANIEL. As part of their investigation, Cincinnati VCS has acquired multiple Confidential Human Sources (Hereinafter "CHS2," "CHS3," and "CHS4") who have been able to make several law enforcement controlled purchases of crack cocaine and fentanyl from NEWTON and DANIEL between January and March 2020. These controlled purchases were all arranged through one of the Confidential Human Sources contacting either NEWTON or DANIEL, and in one instance an unknown associate of DANIEL, via phone call. During these phone calls, NEWTON and/or DANIEL would arrange for the Confidential Human Source to meet them at a specific meeting location in order to execute the transaction. These transactions were overseen by Cincinnati VCS, who conducted a search of the Confidential Human Sources

---

[1] CHS1 has provided information to law enforcement which has been corroborated and confirmed to be reliable. CHS1 is providing information to law enforcement in exchange for case consideration in reference to criminal charges against CHS1. CHS1 has a criminal history which includes drug trafficking and firearms violations.

before and after each controlled purchase of narcotics and who conducted physical surveillance during the controlled purchases.

14. In mid-January 2020, CHS2[2] contacted NEWTON via phone call at 513-417-2157 in order to arrange a controlled purchase of fentanyl. In the call, NEWTON and CHS2 agreed upon an amount of fentanyl and a price for the exchange. NEWTON then directed CHS2 to a particular location in the Cincinnati, OH area in order to execute the exchange. Prior to traveling to the arranged meeting location, CHS2 was searched for any contraband and was provided with a covert audio/video recorder by Cincinnati VCS. CHS2 then traveled to the pre-arranged meeting location while physical surveillance was being conducted by Cincinnati VCS. Upon arriving at the meeting location, CHS2 was met by DANIEL who then provided CHS2 with an amount of fentanyl for the agreed upon price that had been arranged in the phone call by NEWTON. After the transaction, CHS2 met with Cincinnati VCS and provided them with the fentanyl obtained from DANIEL along with the covert recording device which was utilized to memorialize the exchange. CHS2 was again searched by Cincinnati VCS for any contraband. Cincinnati VCS subsequently obtained lab results from the Hamilton County Coroner's Lab confirming that the substance provided in this exchange by DANIEL was indeed fentanyl.

15. Also in mid-January 2020, CHS3[3] contacted the 513-227-1834 in order to arrange the controlled purchase of crack cocaine. During this call, an unknown associate of DANIEL answered the telephone and arranged a price and meeting location for the transaction. Prior to

[2] CHS2 has provided information to law enforcement which has been corroborated and confirmed to be reliable. CHS2 is providing information to law enforcement in exchange for monetary compensation. CHS2 has a criminal history which includes theft, unauthorized use of property, and domestic violence.
[3] CHS3 has provided information to law enforcement which has been corroborated and confirmed to be reliable. CHS3 is providing information to law enforcement in exchange for case consideration in reference to criminal charges against CHS3. CHS3 has a criminal history which includes drug possession, possession of drug paraphernalia, criminal damaging, and disorderly conduct.

traveling to the arranged meeting location, CHS3 was searched by Cincinnati VCS investigators for contraband and was provided with a covert audio/video recorder. CHS3 then traveled to the meeting location while under physical surveillance by Cincinnati VCS. Upon arrival at the meeting location, CHS3 exchanged money for crack cocaine with the unknown associate of DANIEL who was observed by surveillance units to be a black male approximately 20 to 25 years of age. After the transaction occurred, CHS3 met with Cincinnati VCS Units and provided them with the crack cocaine obtained from the unknown male. CHS3 was again searched for contraband by Cincinnati VCS and provided them with the covert recorder that had been utilized to memorialize the drug transaction. Cincinnati VCS subsequently obtained lab results from the Hamilton County Coroner's Lab confirming that the substance provided by the unknown male to CHS3 was indeed cocaine.

16. In early February 2020, CHS4[4] contacted NEWTON via phone call on a phone known by investigators to be utilized by NEWTON, 513-417-2157, in order to arrange a controlled purchase of fentanyl. In the call, NEWTON and CHS4 agreed upon an amount of fentanyl and a price for the exchange. NEWTON then directed CHS4 to a specific location in the Cincinnati, OH area in order to execute the transaction. Prior to traveling to the meeting location, CHS4 was searched by Cincinnati VCS for contraband and was provided with a covert audio/video recorder. CHS4 then traveled to the meeting location while under physical surveillance by Cincinnati VCS. Upon arrival at the meeting location, CHS4 was met by both NEWTON and DANIEL who were in a silver 2007 Infiniti sedan bearing Ohio License plate HWH7079, with NEWTON in the driver's seat and DANIEL in the passenger's seat.

[4] CHS4 has provided information to law enforcement which has been corroborated and confirmed to be reliable. CHS4 is providing information to law enforcement in exchange for case consideration in reference to criminal charges against CHS4. CHS4 has a criminal history which includes drug possession and falsification.

NEWTON then executed the exchange with CHS4, providing CHS4 with fentanyl for the agreed upon amount of money.  After the exchange, CHS4 met with Cincinnati VCS and provided them with the fentanyl obtained from NEWTON in the exchange.  CHS4 was again searched by Cincinnati VCS for any contraband and provided them with the covert recorder which was utilized to memorialize the exchange with NEWTON.  Cincinnati VCS subsequently obtained lab results from the Hamilton County Coroner's Lab confirming that the substance provided in this exchange by NEWTON was indeed fentanyl.

17. In mid-February 2020, CHS4 contacted DANIEL via phone call at 513-227-1834 in order to arrange the controlled purchase of fentanyl.  CHS4 was then directed by DANIEL to contact NEWTON on his cellular phone, 513-417-2157, in order to arrange the transaction. CHS4 then contacted NEWTON who arranged a meeting location in order to execute the transaction with CHS4.  Prior to traveling to the meet location, CHS4 was searched for contraband by Cincinnati VCS and was provided with a covert audio/video recorder.  CHS4 then traveled to the agreed upon meeting location while under physical surveillance by Cincinnati VCS.  At the meeting location, CHS4 met with NEWTON who was again observed operating the 2007 Infiniti sedan bearing Ohio license plate HWH7079. NEWTON then provided CHS4 with an amount of fentanyl for the agreed upon amount of money.  CHS4 then left the meet location and met with Cincinnati VCS and provided them with the fentanyl obtained from NEWTON.  CHS4 was again searched by Cincinnati VCS for contraband, and provided them the covert recorder that was utilized to memorialize the exchange with NEWTON.  Cincinnati VCS subsequently obtained lab results from the Hamilton County Coroner's Lab confirming that the substance provided in this exchange by NEWTON was indeed fentanyl.

18. In early March 2020, CHS4 contacted DANIEL via phone call at 513-227-1834 in order to arrange the controlled purchase of fentanyl. CHS4 was then directed by DANIEL to a specific meeting location in the Cincinnati, OH area in order to execute the exchange. Prior to traveling to the meeting location, CHS4 was searched for contraband by Cincinnati VCS and was provided with a covert audio/video recorder. CHS4 then traveled to the pre-arranged meeting location while under physical surveillance by Cincinnati VCS and Cincinnati FBI units. A short time after CHS4 arrived at the meeting location, DANIEL arrived in the silver Infiniti sedan bearing Ohio License plate HWH7079. An exchange then occurred between CHS4 and DANIEL in which DANIEL provided what is believed to be fentanyl to CHS4 in exchange for money. After the transaction was complete, CHS4 met with Cincinnati VCS and provided them with the suspected fentanyl obtained from DANIEL. CHS4 was again searched for contraband by Cincinnati VCS and provided them with the covert recorder which was used to memorialize the exchange with DANIEL.

19. In mid-March 2020, CHS4 contacted DANIEL via phone call at 513-227-1834 in order to arrange the controlled purchase of fentanyl. DANIEL then arranged for CHS4 to meet with NEWTON at a specific meeting location in the Cincinnati, OH area in order to conduct the transaction. Prior to traveling to the meeting location, CHS4 was searched for contraband by Cincinnati VCS and was provided with a covert audio/video recorder. CHS4 then traveled to the pre-arranged meeting location while under physical surveillance by Cincinnati VCS and Cincinnati FBI units. CHS4 then met with NEWTON who provided CHS4 with an amount of what is believed to be fentanyl for the agreed upon price. During these events, NEWTON advised CHS4 to contact him at 513-693-3004, the **TARGET TELEPHONE,** in the future. NETWON additionally contacted CHS4 via phone call from the **TARGET TELEPHONE** during the events surrounding the drug transaction. After completing the drug transaction with

9

NEWTON, CHS4 met with Cincinnati VCS and provided them with the suspected fentanyl obtained from NEWTON. CHS4 was again searched for contraband by Cincinnati VCS and provided them with the covert recorder which was used to memorialize the exchange with NEWTON.

20. Further, in mid- March, 2020 your Affiant sent an administrative subpoena to Sprint requesting the subscriber information and the last 30 days of toll records for the **TARGET TELEPHONE.** Sprint responded to the subpoena one day after it was requested and provided that the subscriber for the **TARGET TELEPHONE** is "MICHAEL JORDAN".  Additionally, Sprint provided that the account was established on July 23, 2019 and the address associated with the account is 3091 W. Galbraith Rd. Ste 207 Cincinnati, OH 45239.  Further, the **TARGET TELEPHONE** is a Boost prepaid account with an account number of 742873638.

21.  Based on my training, experience, knowledge of this investigation, along with the aforementioned facts and reporting, I believe there is probable cause to show that the **TARGET TELEPHONE** is being used to commit federal narcotics offenses and the information requested will assist the FBI in identifying co-conspirators, stash locations, and additional cellular devices owned and operated by the target subjects.  I further know based on my training and experience that those involved in drug trafficking often change their phone numbers in an effort to thwart law enforcement.  Additionally, I know that drug traffickers often utilize pre-paid cellular phones, such as the **TARGET TELEPHONE**, to facilitate their illegal activities. I know, based on my training and experience, that drug traffickers often provide false names for these pre-paid cellular accounts in an effort to avoid detection by law enforcement.  Based on my training and experience, I believe that the name "MICHAEL JORDAN" is a fictitious name on the account belonging to the **TARGET TELEPHONE**.  Further, an analysis of the toll records provided by Sprint revealed that the **TARGET TELEPHONE** has been in contact

with 513-227-1834, which investigators know to be primarily utilized by DANIEL and which has been utilized to arrange the controlled purchase of narcotics as described in the paragraphs above. Toll records analysis of the **TARGET TELEPHONE** has additionally revealed that it has been in contact with 513-417-2157. As described in the paragraphs above, 513-417-2157 is another phone number from which investigators have arranged the controlled purchase of narcotics which was previously used by NEWTON.

22. Based on my training, experience, and discussions with other law enforcement officers/agents, activities observed during surveillance, and reliable CHS information, I believe that NEWTON is utilizing the **TARGET TELEPHONE** in furtherance of facilitating illicit narcotics transactions with other as-yet-unidentified individuals, that those transactions are federal narcotics offenses, and that the information requested will assist the FBI in identifying co-conspirators and additional cellular devices owned and operated by the targeted subjects.

23. In my training and experience, I have learned that providers of cellular telephone services have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas,

and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

24. Based on my training and experience, I know that wireless phone companies can collect E-911 Phase II data about the location of a target cell phone, including by initiating a signal to determine the location of the target cell phone or with such other reference points as may be reasonably available.

25. Based on my training and experience, I know that wireless phone companies can also collect cell-site data about the target cell phone.

## AUTHORIZATION REQUEST

26. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

27. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a (b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a (b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information,

there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a (b)(2).

28. I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint. I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint services, including by initiating a signal to determine the location of the target cell phone on the Sprint network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance. I further request that the Court authorize the government to install and operate a cell-site simulator to obtain dialing, routing, addressing, and signaling information from the target cell phone to determine the location of the target cell phone. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the target cell phone outside of daytime hours. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation.  Accordingly, there is probable cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

29. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Respectfully submitted,

_____
Joseph H. Klump
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this __16th__ day of March, 2020.

_____
HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE